IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOCELYN POLIKOFF,

    Plaintiff,

vs.                                                           No. CIV 11-831-JC/ACT

SOCIAL SECURITY ADMINISTRATION,

    Defendant(s).

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

**THIS MATTER** comes before the Undersigned on the Order of Reference by the Honorable Chief Judge Bruce Black[2] [Doc. 17] filed on January 12, 2012, to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case. The Court has directed the Undersigned to submit an analysis, including findings of fact, if necessary, and recommend disposition. Accordingly, the Undersigned submits the following:

1. Plaintiff Jocelyn Polikoff ("Plaintiff") filed Plaintiff's Motion to Reverse or Remand Decision of the Commissioner and Brief in Support Thereof [Doc. 21] on April 16, 2012 ("Motion"). Defendant Michael J. Astrue, the Commissioner of the Social Security Administration ("Defendant"), filed his Response [to] Plaintiff's Motion to Reverse or Remand [Doc. 24] on July 16, 2012 ("Response"). Plaintiff did not file a Reply. Having considered the Motion, the memoranda submitted by the parties, the administrative record, and the applicable

---

[1] The parties will be given the opportunity to object to the Report and Recommendation as described in 28 U.S.C. § 636(b)(1). Objections must be filed within fourteen (14) days after being served with a copy of the Report and Recommendation. A party waives the right to challenge the Magistrate Judge's Report and Recommendation if the party does not file timely and specific objections.

[2] On September 14, 2012, this case was reassigned to the Honorable District Judge John E. Conway. [Doc. 25.]

law, the Undersigned finds that the Motion is not well taken and recommends that it be DENIED.

## I. PROCEDURAL RECORD

2. On June 2, 2008, Plaintiff protectively filed an application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433, alleging disability beginning August 25, 2006. [Tr. 19.] The claim was initially denied on September 26, 2008, and denied again upon reconsideration on January 14, 2009. [Tr. 19, 80 – 83, 88 – 91.] Thereafter, Plaintiff filed a written request for hearing on February 12, 2009. [Tr. 19, 92 – 93.]

3. On September 18, 2009, Barry Robinson, Administrative Law Judge ("ALJ") conducted a hearing. [Tr. 19.] At the hearing, Plaintiff was represented by Attorney Ione Gutierrez. [Tr. 33.] On November 12, 2009, the ALJ issued an unfavorable decision. [Tr. 19 – 26.] In his report, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012; that she has not engaged in substantial gainful activity since August 25, 2006, the alleged onset date; and that Plaintiff has severe impairments consisting of sleep apnea, insomnia, Major Depression, Post-traumatic Stress and Borderline Personality Disorders. [Tr. 21.] However, the ALJ found that Plaintiff was not disabled at step five of the sequential evaluation. Specifically, the ALJ found that Plaintiff "has the residual functional capacity to perform "light" work as defined in 20 CFR 404.1567(b) except that she is mentally limited to occupations which require no more than "occasional" interactions with co-workers, supervisors, and the general public." [Tr. 22.] In considering Plaintiff's age, education, work experience and residual functional capacity, the ALJ found Plaintiff "is capable of performing jobs existing in significant numbers in the regional and national economies[.]" [Tr. 25.]

4. On January 8, 2010, Plaintiff requested that the Appeals Counsel review the ALJ's decision. [Tr. 9 – 10.] This request was denied on June 17, 2011. [Tr. 7.][3] Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981. On September 16, 2011, Plaintiff filed her Complaint for judicial review of the ALJ's decision. [Doc. 1.]

## II. STANDARD OF REVIEW

5. Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S. C. § 423(d)(2)(A). In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C.

---

[3] This exhibit appears to be the first page of a multi-page document, however, the other pages are not a part of the record.

[4] Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. 20 C.F.R. § 404.1520(C). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 D.F.R. Pt. 404, Subpt. P, App. 1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can

§ 405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id*., quoting *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its opinion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214 (quotation omitted). In this case, the decision is supported by substantial evidence, and the correct legal standards were applied.

### III. WORK HISTORY

6. Plaintiff was born on June 16, 1951. [Tr. 127.] Plaintiff has a Bachelor of Arts degree in art and education, which she obtained in 1972, and she completed bartending school in October of 2006. [Tr. 37, 159.] Plaintiff previously worked as a rural mail carrier, a seamstress, and a food server. [Tr. 37, 42, 50, 156.] One month prior to the hearing before the ALJ, Plaintiff served as an extra for a television show "Crash", which entailed her pretending to be in a conversation at a dinner table. [Tr. 54.] In order to be an extra, Plaintiff was required to stand on the set and wait to be called and then perform her pretend dinner conversation "over and over" for a total of four hours. [Tr. 54.] Plaintiff also testified that previous jobs as an extra had her on the set for ten hours a day. [Tr. 55.] Plaintiff agreed that she had her name in for additional jobs as an extra. [Tr. 55.] Plaintiff's earnings record shows that she has acquired sufficient quarters of coverage to

---

perform. *Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

remain insured through December 31, 2012, thus, Plaintiff must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. [Tr. 19.]

## IV. MEDICAL HISTORY

7. Plaintiff was 57 years old at the time she applied for DIB and was 58 years old on the date the ALJ issued his unfavorable decision. [TR. 36, 127.] In applying for benefits, Plaintiff stated she "became unable to work because of my disabling condition on August 25, 2006." [Tr. 127.] Specifically, Plaintiff claims she is unable to work due to depression, borderline personality disorder, insomnia, "chemo brain," and sleep apnea. [Tr. 155.] The following represents Plaintiff's medical history prior to the date she was last insured (December 31, 2012). [Tr. 19.]

A. Breast Cancer

8. Plaintiff was diagnosed and treated for breast cancer in 2000. While the record does not include medical records for treatment in 2000, the fact that Plaintiff was treated for breast cancer at that time is notated throughout the medical records provided. In November of 2008, Plaintiff's physician from the New Mexico Cancer Center, Timothy Lopez, M.D., recites that Plaintiff's treatment included a mastectomy of her left breast followed by chemotherapy, radiation, and tamoxifen. [Tr. 386.] He further notes Plaintiff is "[f]ree of disease from the breast cancer aspect . . . ." [Tr. 386.] Plaintiff claims she suffers from "chemo-brain" as a result of her breast cancer treatment which is further discussed below. [Tr. 155.]

B. Major Depressive Disorder and Borderline Personality Disorder

9. Plaintiff was diagnosed with major depressive disorder in 2005. [Tr. 223.] She was treated at St. Vincent Regional Medical Center between November 2005 and January 2006 in an Intensive Outpatient Program ("IOP"). [Tr. 213 - 284.] Plaintiff was scheduled for 16 sessions.

[Tr. 215.] She was discharged in January of 2006, after 14 sessions, because she had difficulty getting off of work to attend the sessions on time. [Tr. 240, 241.] Plaintiff reported she had attended counseling on and off since her late twenties. [Tr. 272.]

10. In April of 2007, Plaintiff resumed treatment for depression with Jill-Marie Tiedemann, LPCC,[5] who diagnosed Plaintiff with major depressive disorder and borderline personality disorder. [Tr. 454, 457.] Plaintiff was treated with DBT Therapy [6] until March of 2008. [Tr. 406.] Therapy ended when Plaintiff was put on "vacation" due to "inconsistent commitment to treatment." [Tr. 406, 407.] The progress notes indicate that Plaintiff was almost always late to appointments. [Tr. 406 – 453.]

11. In April of 2008, Plaintiff sought treatment at the Santa Fe Community Guidance Center – PMS.[7] Plaintiff attended couple's therapy and individual therapy. [Tr. 332.]

12. In June of 2008, Plaintiff had an appointment with Dr. Lopez and reported that she had been severely depressed since her treatment with chemotherapy and "her life has been falling apart." [Tr. 388.]

13. In December of 2008, Plaintiff began treatment at The Life Link, where she was diagnosed with Major Depressive Disorder, "recurring and severe," and PTSD.[8] [Tr. 476-77.] Plaintiff agreed to attend EMDR[9] sessions for twelve weeks. [Tr. 466.]

---

[5] Licensed Professional Clinical Counselor.

[6] Dialectical Behavior Therapy (DBT) is a specific type of cognitive-behavioral psychotherapy developed in the late 1980s by psychologist Marsha M. Linehan to help better treat borderline personality disorder. Since its development, it has also been used for the treatment of other kinds of mental health disorders. Dialectical behavior therapy (DBT) treatment is a cognitive-behavioral approach that emphasizes the psychosocial aspects of treatment. The theory behind the approach is that some people are prone to react in a more intense and out-of-the-ordinary manner toward certain emotional situations, primarily those found in romantic, family and friend relationships. DBT theory suggests that some people's arousal levels in such situations can increase far more quickly than the average person's, attain a higher level of emotional stimulation and take a significant amount of time to return to baseline arousal levels. http://psychcentral.com/lib/2007/an-overview-of-dialectical-behavior-therapy/all/1

[7] Presbyterian Medical Services.

14. In January of 2009, Dr. Jafet E. Gonzalez-Zakarchenco performed a psychiatric evaluation of Plaintiff and recommended therapy. [Tr. 470 – 475.]

15. In April of 2010, Plaintiff was admitted into inpatient psychiatry at CHRISTUS St. Vincent Regional Medical Center "after getting into a rage attack and engaging in self-mutilation behaviors." [Tr. 485.] Plaintiff was discharged after six days. *Id.*

   C.  <u>Insomnia and Sleep Apnea</u>

16. Plaintiff reported her difficulties with insomnia and chronic fatigue beginning in 2005. [Tr. 261, 273.] Since that time, Plaintiff consistently reported that she suffers from insomnia for which she was prescribed Ambien,[10] and sleep apnea for which she was prescribed a "CPAP"[11] with oxygen. [Tr. 305, 306, 307, 314, 315, 318, 335, 427, 462, 470, 476, 487.] Plaintiff testified that she takes Ambien but not in a timely manner. [Tr. 46.] Plaintiff additionally testified that she does not use her CPAP because it is too hard to keep it clean. [Tr. 47.] Plaintiff reported to her healthcare providers that she often stays up all night, several times a week, many times playing computer games. [Tr. 409, 415, 416, 418, 419 – 22, 432, 439 and 447.] Plaintiff testified that her only physical limitation is fatigue. [Tr. 44.]

---

[8] Post-traumatic stress disorder (PTSD) is a mental health condition that's triggered by a terrifying event. Symptoms may include flashbacks, nightmares and severe anxiety, as well as uncontrollable thoughts about the event. http://www.mayoclinic.com/health/post-traumatic-stress-disorder/DS00246

[9] Eye movement desensitization and reprocessing (EMDR) is a psychotherapy developed by Francine Shapiro, which emphasizes disturbing memories as the cause of psychopathology and alleviates the symptoms of PTSD. EMDR is used for individuals who have experienced severe trauma which remains unresolved. http://en.wikipedia.org/wiki/Eye_movement_desensitization_and_reprocessing

[10] Ambien (zolpidem) is a sedative, also called a hypnotic. It affects chemicals in your brain that may become unbalanced and cause sleep problems (insomnia). Ambien is used to treat insomnia. http://www.drugs.com/ambien.html

[11] CPAP, or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open. CPAP typically is used by people who have breathing problems, such as sleep apnea. http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/

D.  Chemo-Brain

17. In June of 2008, Plaintiff reported to her healthcare providers that she thought her depression, lack of focus and concentration were due to "chemo-brain."[12]  [Tr. 334, 342 and 388.]  Plaintiff offers an article from Neurology Reviews.Com discussing "chemo-brain." [Tr. 343-45.]  The ALJ found that "such an impairment is not established in the medical evidence of record through acceptable diagnostic testing or laboratory findings as a medically determinable impairment. [Plaintiff's] oncologist has reported that Ms. Polikoff has symptoms that 'she feels' are attributable to Chemo-Brain, and this physician goes no further than to mention the 'possibility' that she has trouble focusing due to Chemo-Brain.  This alleged condition is not established in the objective evidence as a diagnostically confirmed medically determinable impairment." [Tr. 21.]  These findings are not disputed by Plaintiff in this appeal.

E.  Physical and Psychological Exams Scheduled by Commissioner

18. A psychiatric review of Plaintiff in August of 2008 found that her impairment, depression, was not severe. [Tr. 346.]  Similarly, a medical review in September of 2008 found that "Claimant's physical impairments are nonsevere." [Tr. 360.]   A second psychiatric and medical review took place in January of 2009 which found no significant change in Plaintiff's overall mental or physical status.  [Tr. 396 and 397.]

**IV. DISCUSSION**

19. Plaintiff asserts that the ALJ committed error by using the incorrect Grid Rule[13] at step five of the sequential evaluation process. [Doc. 21 at 9 – 11.] Specifically, Plaintiff claims that

---

[12] "Chemo brain" is a common term used by cancer survivors to describe thinking and memory problems that can occur after cancer treatment. Chemo brain can also be called chemo fog, chemotherapy-related cognitive impairment or cognitive dysfunction. http://www.mayoclinic.com/health/chemo-brain/DS01109

[13] The grids contain tables of rules which direct a determination of disabled or not disabled on the basis of a claimant's RFC category, age, education, and work experience. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2). "Under the Secretary's own regulations, however, 'the grids

the ALJ found that Plaintiff met the criteria for Grid Rule 202.08 when he should have used Grid Rule 202.06, which would direct a finding of disabled. [Doc. 21, at 11.] Plaintiff's premise is incorrect. The ALJ did not use Grid Rule 202.08 to make his determination of non-disabled. Rather, the ALJ properly relied on Grid Rule 202.08 as a framework for his decision because he found that Plaintiff had both exertional and nonexertional limitations. [Tr. 22 – 24 and 25 (ALJ explaining he used the medical vocational rules as a "framework" for his decision)].

20. In step five of the sequential evaluation process, the ALJ bears the burden to show that there are jobs in the regional or national economies that the claimant can perform with the limitations the ALJ has found to be present. *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999) (citing, e.g., *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir.1993)). It is not the claimant's burden to produce or develop vocational evidence at step five. *Id.* When a claimant's exertional level, age, education, and skill level (i.e., work experience) fit precisely within the criteria of a Medical Vocation Guideline Rule or "Grid Rule," an ALJ may base a determination of disability or nondisability conclusively on the grids. *Haddock*, 196 F.3d at 1088 (citing *Trimiar v. Sullivan*, 966 F.2d 1326, 1332 (10th Cir.1992)); see also 20 C.F.R. pt. 404, Subpt. P, app. 2, § 200.00(a) & Table No. 1.

21. However, where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and accordingly, does not direct a conclusion of disabled or not disabled. *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984) (quoting App.2 §200.00(a)). Because the grids consider only impairments that result in

---

may not be applied conclusively in a given case unless the claimant's characteristics precisely match the criteria of a particular rule.' " *Id.* (quoting *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir.1987)(other citations omitted)). A mismatch may occur because of a particular exertional or nonexertional impairment, or a particular combination of impairments. *Id.*

exertional or strength limitations, they may not be fully applicable where other, nonexertional impairments are present. *Channel*, 747 F.2d at 580. As the regulations make clear, the RFC categories in the grids are based on the physical exertion requirements of work in the national economy. *Id.* (citing 20 C.F.R. § 404.1567). Thus, a claimant's placement in a particular category depends on her "ability to do physical activities such as walking, standing, lifting, carrying, pushing, pulling, reaching, [and] handling." *Id.* (quoting 20 C.F.R. § 404.1545(b)). Mental impairments, such as the "ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, co-workers and work pressures in a work setting," are nonexertional, as are psychiatric disorders. *Id.* (quoting 20 C.F.R. § 404.1545(c)). The effect of a particular nonexertional impairment varies depending on the circumstance of the case. *Id.*

22. In recognition of the limited utility of the grids in such cases, the regulations set out the following procedure for determining claims where both exertional and nonexertional impairments are present:

> (2) [W]here an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in the subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience <u>provide a framework</u> for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations. Also, <u>in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this appendix 2, full consideration must be given to all of the relevant facts</u> in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into adjudicative weight to be accorded each factor.

20 C.F.R. 404, Subpt. P, App. 2, § 200.00(e)(2)(emphasis added). Courts have not hesitated to overturn determinations of "not disabled" where an ALJ conclusively has applied the grids

without sufficiently considering the claimant's nonexertional impairments. *Channel*, 747 F.2d at 581.

23. There is no dispute that Plaintiff has both exertional and nonexertional limitations. The ALJ found that Plaintiff "has the residual functional capacity to perform 'light' work as defined in 20 C.F.R. 404.1567(b) except that she is mentally limited to occupations which require no more than 'occasional' interactions with co-workers, supervisors, and the general public. " [Tr. 22, 24.] As the ALJ described, Plaintiff "clearly retains the ability to lift ten pounds frequently and twenty pounds occasionally; to sit, stand, and walk six cumulative hours per workday; push/pull with her upper and lower extremities within the strength limitations cited; and has no postural, manipulative, visual, communicative, or environmental limitations." [Tr. 24.] The ALJ further found "mild" limitations in Plaintiff's mental status which primarily stemmed from "deficits in her ability to consistently get along with others, warranting 'moderate' limitations in social functioning." [Tr. 24.] Accordingly, the ALJ found Plaintiff is "best suited for occupations which do not require more than 'occasional' interaction with supervisors, coworkers, and the general public." [Tr. 24.] These findings are not disputed by Plaintiff. Plaintiff also does not dispute that the ALJ's findings are supported by substantial evidence.

24. The Tenth Circuit further explains:

> The grids may satisfy the Secretary's burden of coming forward with evidence as to the availability of jobs the claimant can perform only where the claimant suffers solely from exertional impairments. To the extent that nonexertional impairments further limit the range of jobs available to the claimant, the grids may not be relied upon to demonstrate the availability of alternative work activities. <u>Instead, in such cases the Secretary must produce a vocational expert to testify that the particular claimant retains the ability to perform specific jobs which exist in the national economy</u>.

*Channel*, 747 F.2d at 581 (quoting *Grant v. Schweiker*, 699 F.2d 189 (4th Cir. 1983))(emphasis added). In other words, once the ALJ has determined that both exertional and nonexertional

11

limitations are present he must do two things: 1) fully consider all of the relevant facts, see 20 C.F.R. 404, Subpt. P, App. 2, § 200.00(e)(2); and 2) produce a vocational expert to testify that the particular claimant retains the ability to perform specific jobs which exist in the national economy. *Channel*, 747 F.2d at 581. In this case, the ALJ took both of these steps.

25. The ALJ considered all of the relevant facts with regard to Plaintiff's physical and mental medical history. The ALJ found that Plaintiff was treated for breast cancer and is currently free of cancer recurrence [Tr. 22]; that Plaintiff was prescribed medication for chronic insomnia and a CPAP for sleep apnea, *Id.*; that Plaintiff has a history of mental health treatment for Major Depression and anger issues [Tr. 22 and 23]; that Plaintiff controls anger symptoms with medication [Tr. 23]; that there are many references indicating that Plaintiff has failed to actively participate in her mental health therapy and being non-compliant *Id.*; and that her primary physical problem appears to be insomnia. *Id*. He also notes that Plaintiff spends much of her time staying up all night playing computer games [Tr. 22 – 23], and "[t]he distinct possibility that Ms. Polikoff's nocturnal activities constitute volitional behavior cannot be ignored." [Tr. 23.]

26. With regard to Plaintiff's physical activities and work experience, the ALJ notes that Plaintiff has no problems with personal care and she participates in a wide range of activities. [Tr. 23 – 24.] The ALJ found that Plaintiff is unable to perform any past relevant work; that she is of advanced age; that she has at least a high school education, can communicate in English; and that she has no transferable skills from her past relevant work. [Tr. 24.] All of these are relevant facts in this case.

27. Next, the ALJ properly relied on a vocational expert who testified that an individual with the same age, education, past relevant work experience, and RFC as the Plaintiff could perform

the specific jobs of Mail Clerk, File Clerk or Laundry Folder, all of which exist in significant numbers in the national economy. [Tr. 25, 56 – 73.]

28. Plaintiff's concern is that the ALJ did not take into account that Plaintiff graduated from college more than thirty (30) years prior to the adjudication of her alleged disability. [Doc. 21 at 10 – 11.] Plaintiff argues that pursuant to Social Security Ruling 83-10, the "criterion of 'high school graduate or more – provides for direct entry into skilled work' is met when there is little time lapse between the completion of formal education and the date of adjudication . . . ." [Doc. 21 at 10.] Plaintiff criticizes the ALJ for failing to discuss this criterion when finding that Plaintiff was a high school graduate or more because there was not a "little time lapse" between the completion of Plaintiff's formal education and the date of adjudication. [Doc. 21 at 10-11.] Discussion of this criterion, however, is not necessary because Plaintiff's remote education is not a relevant fact. Plaintiff completed her college education in 1975 with a major in art and education. Plaintiff's relevant work experience includes working as a rural mail carrier, a seamstress, a food server, and an extra in TV shows. None of these occupations reflect the use of Plaintiff's art and education degree. Further, the specific jobs within the national economy which Plaintiff can perform, according to the vocational expert, do not require a degree in art and education. Therefore, Plaintiff's college education has no impact on whether she could use the skills she acquired in 1975 for the work she is able to perform today. Therefore, whether there was a little time lapse between Plaintiff's college education and the adjudication is not a relevant fact in this case. Since the timing of Plaintiff's education is not a relevant fact, it was unnecessary for the ALJ to discuss it. Accordingly, the ALJ properly found that "a finding of 'not disabled' was appropriate under the framework of [Grid] Rule 202.08." [Tr. 25.]

## V. RECOMMENDATION

29. Since the ALJ's decision is supported by substantial evidence and the correct legal standards were applied, it is recommended that this Court DENY Plaintiff's Motion to Reverse or Remand Decision of the Commissioner and Brief in Support Thereof [Doc. 12] and AFFIRM the decision of the ALJ.

_____
Alan C. Torgerson
United States Magistrate Judge